Brian S. King, #4610
Brent Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHRISTINE S., and JAMES A., individually and on behalf of T.A. a minor,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD of NEW MEXICO, and the LOS ALAMOS NATIONAL SECURITY, LLC HEALTH PLAN.<br><br>　　　　Defendants. | AMENDED COMPLAINT<br><br>Civil No. 2:18-cv-00874 BCW |

Plaintiffs Christine S. ("Christine"), and James A. ("James"), individually and on behalf of T. A. ("T.") a minor, through their undersigned counsel, complain and allege against Defendants Blue Cross Blue Shield of New Mexico ("BCBS") and the Los Alamos National Security, LLC Health Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Christine and James are natural persons residing in Los Alamos County, New Mexico. Christine and James are T.'s parents.

1

2. BCBS is an insurance company that is part of the national Blue Cross Blue Shield network of providers. BCBS was the third party claims administrator for the Plan during the treatment at issue.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Christine was a participant in the Plan and T. was a beneficiary of the Plan at all relevant times.

4. T. received medical care and treatment at Elevations/Seven Stars Residential Treatment Center ("Elevations"), and Cherry Gulch. Elevations is a licensed residential treatment facility located in Utah that specializes in treating individuals on the autism spectrum. Cherry Gulch is a therapeutic boarding school located in Idaho that is licensed by the state as a residential care facility. Both facilities provide sub-acute treatment to adolescents with mental health, and/or behavioral problems.

5. BCBS denied claims for payment of T.'s medical expenses in connection with his treatment at Elevations and Cherry Gulch. This lawsuit is brought to obtain the Court's order requiring BCBS to pay T.'s unpaid expenses incurred during treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because a substantial portion of the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### T.'s Developmental History and Medical Background

9. T. and his twin were born prematurely at 31 weeks gestation via emergency cesarean section. T. spent 6 weeks in the NICU, and then after being released, continued to use oxygen for the next nine months. T. had some delayed milestones such as walking, and he started speech, occupational, and developmental therapy.

10. T. had difficulty with structured activities, and was frequently in conflict with his peers and his family. When he was six or seven, T. periodically was given yellow slips for poor behavior, and he was suspended after hurting another child on the bus.

11. T. had high energy levels and started engaging in a variety of activities such as soccer, basketball, and hockey. He had to withdraw from wrestling because he was overly aggressive with the other wrestlers.

12. T. struggled to make and keep friends, and became jealous of his brother who seemed to make friends easily. T. started taking medications and seeing a therapist with only limited effect.

13. By the time that T. was ten or twelve, his behavior had further deteriorated. He would lie and steal from his family, he binged on food and seemingly couldn't control himself. He attempted suicide by hanging himself in his closet. T.'s family had to lock up the

refrigerator and kitchen cabinets to keep his eating under control, and they each had safes in their room to keep T. from stealing their wallets and valuables.

14. In May of 2015, T. got into a disagreement with his parents over taking out the trash, and again attempted suicide by hanging. T. switched psychiatrists, and was diagnosed with severe anxiety in addition to his ADHD, depression, and emotional dysregulation. T.'s therapist suspected that he was on the autism spectrum; this suspicion would later be confirmed.

15. T.'s behavior continued to worsen as he started middle school. T. ran away from home on multiple occasions, he would constantly get in fights with his brother, had multiple in-school-suspensions for his behavior, and had altercations at the skate park. T. started wrestling again, but almost got kicked off the team after he got in a fight with another wrestler on the bus.

16. T. started self-harming by cutting and banging his head, and he was physically and verbally aggressive with his family. T. would draw on himself in an attempt to disguise the severity of his cutting. He started refusing to go to school and when he did go, he would often intentionally be disruptive or sleep in class. T. started failing his classes. After his parents discovered his cutting, they conferred with an educational consultant who suggested that T. be taken to a residential treatment center.

**Elevations**

17. T. was admitted to Elevations on November 23, 2015, and was immediately placed on suicide/self-harm precautions. T.'s Psychiatric Evaluation/Admission Note from Elevations stated in part:

> …he is suicidal with urges to self-harm "If I could find something to hurt myself with, I would" or "I would bang my head till it cracks, if I could." Hopeless, he

> appears scared at time, [sic] frantic with his retorts. [T.] reports hearing voices at night, with bad dreams… Impulsivity high, judgment severely impaired in context to developmental age. …

18. A multidisciplinary evaluation conducted at Elevations by Dr. Gordon Day on February 8, 2016, stated in part:

    > …Given the level of psychological distress he has experienced and the level of self-harm and agitation seen when he arrived, he appears to be very vulnerable to emotional distress. His safety would be at risk if he were to return home to attend a public school. A very high level of residential therapeutic and academic support is needed. …

19. On February 12, 2016, BCBS sent the Plaintiffs a letter denying payment for T.'s treatment at Elevations as of February 12, 2016. The reviewer wrote:

    > …Per the medical necessity provision of your benefit booklet and/or summary plan description a medical necessity review has been completed. Based on the clinical information provided, you did not meet MCG care guidelines for continued treatment at the MENTAL HEALTH ACUTE INPATIENT (IP) level of care for the following reasons: You are not an acute danger to yourself or others. You are not psychotic and you have a supportive family. From the clinical evidence, you can be safely treated in a less restrictive setting such as Mental Health Outpatient(OP). The last medically necessary date after this review is 02/11/16. …

20. On August 10, 2016, Christine submitted a level one appeal of the denial of T.'s treatment at Elevations. She asked that BCBS review all of the dates that T. was in treatment. She wrote that while BCBS referenced the Milliman Care Guidelines ("MCG"), there are multiple versions of the MCG and she was not told which one BCBS had used to come to the decision to deny care. She requested clarification of which edition was used so that she could properly advocate for T.

21. She contended that BCBS was in violation of ERISA by not making specific references to the medical records it had used to come to the decision to deny care, and by not providing the name and qualifications of the reviewer.

5

22. She wrote that BCBS had evaluated T.'s treatment using guidelines for acute inpatient care. She stated that Elevations provided care that was strictly sub-acute in nature, and that sub-acute care was the generally accepted industry standard for residential treatment centers and was congruent with widely held standards of medical practice.

23. Christine argued that BCBS and its unnamed reviewer had not taken into account that the medical professionals that had personally treated T. had recommended residential treatment as the most appropriate treatment modality for his condition, and that he had attempted treatment at lower levels of care without effect.

24. She included copies of T.'s medical records with the appeal. These records showed that at Elevations, T. continued to struggle with his behavioral and emotional regulation. He threw frequent tantrums, ignored his responsibilities, destroyed property, and attacked other residents.

25. On August 22, 2016, BCBS sent the Plaintiffs a letter upholding the denial of payment for T.'s treatment at Elevations. The letter stated in part:

> …Per the medical necessity provision of your benefit booklet and/or summary plan description a medical necessity review has been completed. Based on the clinical information provided you did not meet MCG care guidelines for continued care at the Mental Health Residential (RTC) for the following reasons: You were not a danger to yourself or others. You were not noted to be psychotic or manic. You were medically stable. You were compliant with medication regime. You were not violent or aggressive. Based upon the clinical provided, you could have reasonably been transitioned to a less restrictive level of care such as Mental Health Intensive Outpatient (IOP). The Last Covered Day is 2/11/16…

26. On November 1, 2016, Christine requested that the denial of T.'s treatment at Elevations be evaluated by an external review agency. She argued that T.'s treatment was medically necessary and in accordance with generally accepted standards of medical practice. She reiterated that lower levels of treatment had been attempted numerous times without

significant effect, and several of T.'s mental healthcare providers had recommended residential treatment.

27. On December 26, 2016, the external review agency sent the Plaintiffs a letter upholding the denial of T.'s treatment at Elevations. The reviewer gave the following reason for upholding the denial:

> …The published medical literature supports the admission of adolescent patients to residential treatment when there are severe emotional and behavioral symptoms which require 24 hour supervised mental health treatment. The symptoms would need to include one or more of: suicidal or homicidal ideation [not met from 2/12/2016 onwards], or self-harming behaviors [not met from 2/12/2016], serious physical aggression [not met], impairment in ADLs [not met], severe alcohol withdrawal symptoms [not met], out of control disruptive behavior which cannot be safely managed in a PHP setting [not met for the patient from 2/12/2016-4/15/2016], comorbid medical conditions and mental health symptoms which necessitate 24 hour nursing supervision [not met] (Dulcan, 2012; Rutter, 2011). The clinical documentation indicates none of these symptoms was documented. Therefore, based on the evidence-based literature, the mental health residential treatment (RTC) dated 2/12/2016-4/15/2016 was not medically necessary.

### Cherry Gulch

28. T. was admitted to Cherry Gulch on April 18, 2016. During the first week, T. ran away from the program. He was soon found by Cherry Gulch staff walking down a road towards a dam with the intent to jump off of it, and was placed on suicide watch.

29. On April 26, 2016, BCBS sent the Plaintiffs a letter denying T.'s residential treatment from April 26, 2016, forward. The reviewer gave the following justification for the denial:

> …Per the medical necessity provision of your benefit booklet and/or summary plan description a medical necessity review has been completed. Based on the clinical information provided, you did not meet MCG care guidelines for continued treatment at the MENTAL HEALTH RESIDENTIAL TREATMENT (RTC) level of care for the following reasons: You were not reported as being an imminent danger to yourself or others. There was no evidence of inability to adequately care for yourself with functioning in multiple sphere areas. You were not reported as being aggressive or threatening. There was no report of psychosis

or mania. There was no report of medical instability. From the clinical evidence, you can be safely treated in a less restrictive setting such as Mental Health Outpatient (OP). The last medically necessary date after this review is 4/25/2016.
…

30. On October 14, 2016, Christine submitted a level one appeal of the denial of T.'s treatment at Cherry Gulch. Christine stated that while the denial letter only made reference to 15 days of T.'s treatment, she asked that all the dates of T.'s treatment from April 26, 2016, forward be reviewed as T. was still in treatment at the time.

31. Christine wrote that while the reviewer referenced the MCG in the denial letter, there are several editions of the MCG and she was again not told which edition or criteria BCBS had used. She argued that this hindered her ability to properly appeal the denial, and was a violation of ERISA

32. She asserted that BCBS also violated ERISA by failing to provide the names and qualifications of its reviewers, as well as specific references to the medical records it had relied on to come to the decision to deny care.

33. Christine included several letters of medical necessity with the appeal. In a letter dated May 11, 2016, Cynthia Cohen M.S.P.H. wrote in part:

> …Numerous medications along with psychotherapy interventions, had been tried to help him deal with his many issues. None had been effective. Thus, despite psychotherapy, psychopharmacology, family work, school remediation programs, [T.] was unable to function let alone develop any sense of well-being. It was only when we took him out of the home to a residential treatment center with a 24 hour a day program focused intensely on assessment and treatment of adolescents with complicated, inscrutable, psychological issues that he was able to begin to function. …

In a letter dated May 20, 2016, Heather McCulloch L.M.F.T. wrote in part:

> I highly recommend that [T.] remain in intensive inpatient residential treatment so that he has the best possible chances of reintegrating back into the Los Alamos Public Schools and outpatient therapy when it is recommended by the staff of the residential treatment placement currently in place for [T.] In all my years of

8

> experience with [T.], he greatly needs to be in this intensive recommended "residential therapeutic environment" so that he can heal, learn, and succeed in being his best self. …

Child and Adolescent Psychiatrist Dr. Brian Haigh wrote in a letter dated June 2, 2016:

> …I highly recommend that [T.] remain in intensive inpatient residential treatment. I feel that any other course of action would most likely result in a devastating failure for [T.] that would not only be devastating to him emotionally, but require repeated costly admissions back to a higher level of care. A longer stay in a therapeutic environment is his best chance to integrate the skills he has learned and continued [sic] to progress with the ultimate goal of reintegration back into Los Alamos when he is ready. …

34. On October 25, 2016, BCBS sent the Plaintiffs a letter upholding the denial of T.'s treatment at Cherry Gulch. The reviewer gave the following justification for the denial:

> …Per the medical necessity provision of your benefit booklet and/or summary plan description a medical necessity review has been completed. Based on the clinical information provided you did not meet MCG care guidelines for continued care of Mental Health Residential (RTC) level of care based on the following reasons: You do not have severe comorbid substance abuse. You did not have life-threatening inability to receive care from caregivers. You did not have acute severe disability that requires acute stabilization. You can be safely treated at a less restrictive level of care such as Mental Health Outpatient – Office. The Last Covered Day is 4/25/16. …

35. On November 9, 2016, T. attempted suicide at Cherry Gulch by jumping off of a high rock. He ran outside ignoring staff attempts to stop him, and jumped. He broke his wrist and hurt his ankle in the fall. When staff asked T. why he had jumped, he stated "I just wanted to die." After the incident, T. was placed on suicide watch.

36. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

37. The denial of benefits for T.'s treatments was a breach of contract and caused Christine and James to incur medical expenses that should have been paid by the Plan in an amount totaling over $243,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

38. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBS, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

39. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

40. BCBS and the Plan breached their fiduciary duties to T. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in T.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of T.'s claims.

41. The actions of BCBS and the Plan in failing to provide coverage for T.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

42. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

43. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

44. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

45. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

46. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for T.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does BCBS exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner BCBS excluded coverage of treatment for T. at Elevations and Cherry Gulch.

47. The actions of BCBS and the Plan requiring that T. satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities

for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

48. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBS, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

49. The violations of MHPAEA by BCBS and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendants violate MHPAEA;

   (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

   (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

   (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

   (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and BCBS insured plans as a result of the Defendants' violations of MHPAEA;

 (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

 (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

 (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

50. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for T.'s medically necessary treatment at Elevations and Cherry Gulch under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

4. For such further relief as the Court deems just and proper.

DATED this 21st day of March, 2019.

            By   s/ Brian S. King  
               Brian S. King  
               Attorney for Plaintiffs

County of Plaintiffs' Residence:  
Los Alamos County, New Mexico