FILED
2021 OCT 14 AM 10:20
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHRISTINE S. and JAMES A., individually and on behalf of T.A., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF NEW MEXICO and the LOS ALAMOS NATIONAL SECURITY, LLC HEALTH PLAN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-00874-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

This action arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, and is before the court on the parties' cross-motions for summary judgment. Plaintiffs' complaint alleges two causes of action: (1) recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) ("ERISA claim"), and (2) violation of the Mental Health Parity and Addiction Equity Act under 29 U.S.C. § 1132(a)(3) ("Parity Act claim"). Defendants are Blue Cross Blue Shield of New Mexico ("BCBSNM") and Los Alamos National Security, LLC Health Plan ("the Plan"). Both Plaintiffs and Defendants moved for summary judgment.

## BACKGROUND

This dispute involves the denial of benefits allegedly due to Plaintiffs under their ERISA employee group health benefit plan, sponsored by Los Alamos National Security, LLC. Christine S. was a Plan participant at all times relevant to the claims in this case and her son, T.A., was a Plan beneficiary. *See* Rec. 19. Plaintiffs sought care for T.A.'s mental health conditions at two

successive Residential Treatment Centers ("RTCs"), first at Elevations in Utah and then at Cherry Gulch in Idaho. *Id.* 1038. T.A. received care at Elevations from November 23, 2015, through April 15, 2016, and at Cherry Gulch beginning April 18, 2016. *Id.* 234, 1038. It is not apparent from the record how long T.A. remained at Cherry Gulch. BCBSNM authorized coverage for eighty-one days of treatment at Elevations. *Id.* 19. It denied benefits for the remaining sixty-three days of T.A.'s stay at Elevations. *Id.* 19. BCBSNM then authorized coverage for the initial eight days of T.A.'s treatment at Cherry Gulch, then denied benefits for the remainder of his stay. *Id.* 1683. Plaintiffs contend that BCBSNM's denial of benefits caused them to pay over $234,000 in unreimbursed, out-of-pocket expenses. Amended Compl. ¶ 37.

## I.   THE PLAN

The Plan generally covers medically necessary services. Rec. 147. The Plan defines medically necessary services as those that are

- Medical in nature;
- Recommended by the treating physician;
- The most appropriate supply or level of service, taking into consideration potential benefits; potential harms; cost, when choosing between alternatives that are equally effective; and cost effectiveness, when compared to the alternative services or supplies;
- Known to be effective in improving health outcomes as determined by credible scientific evidence published in the peer-reviewed medical literature; and
- Not for the convenience of the member, treating physician, hospital, or any other health provider.

*Id.* For mental health treatment, the Plan additionally requires that the treatment be

- Required for the treatment of a distinct mental disorder as defined by the latest version of the *Diagnostic and Statistical Manual* published by the American Psychiatric Association;
- Reasonably expected to result in significant and sustained improvement in your condition and daily functioning;
- Consistent with your symptoms, functional impairments and diagnoses in keeping with generally accepted national and local standards of care; and
- Provided to you at the least restrictive level of care.

*Id.* 167.

BCBSNM indicated that it also used the Milliman Care Guidelines ("MCG") in its benefit determinations for mental health claims. *Id.* 268, 1620. MCG criteria for discharge from a residential treatment center states that continued residential care is generally needed until one or more of the following:

- Residential care is no longer necessary due to adequate patient stabilization or improvement as indicated by ALL of the following:
    - Risk status acceptable as indicated by ALL of the following:
        - Patient has not recently made a suicide attempt or act of serious harm to self, or has had sufficient relief of precipitants of any such action;
        - Absence of current plan for suicide or serious harm to self or to another are absent or manageable at available lower level of care;
        - Supports, and patient as appropriate, understand follow-up treatment and crisis plan;
        - Provider and supports are sufficiently available at lower level of care; and
        - Patient, as appropriate, can participate as needed in monitoring at next level of care.
    - Functional status acceptable as indicated by 1 or more of the following:
        - No essential function is significantly impaired; or
        - An essential function is impaired, but impairment is manageable at available lower level of care.
    - Medical needs manageable as indicated by ALL of the following:
        - Adverse medication effects absent or manageable at available lower level of care; and
        - Medical comorbidity absent or manageable at available lower level of care.
- Residential care no longer appropriate due to patient progress record or consent as indicated by 1 or more of the following:
    - Patient deterioration requires higher level of care; or
    - Guardian no longer consents to treatment.

*Id.* 5953-54.

## II. T.A.'S CONDITION AND TREATMENT

T.A. was born prematurely and struggled developmentally from a young age. *Id.* 238-39. As T.A. advanced into later elementary grades (ages 10-12), he increasingly struggled to regulate

3

his emotions and interact with peers and family members in a healthy manner. *Id.* 239-40. He was diagnosed with ADHD, depression, and emotional dysregulation. *Id.* 239. T.A. attempted suicide twice before his admission to RTC care, most recently in May 2015. *Id.* 239-40. In fall 2015, T.A.'s behavior deteriorated further. He refused to go to school, began cutting himself, and was destructive and verbally abusive at home. *Id.* 239-41. T.A.'s psychiatrist told his parents that there was nothing further he could do to improve T.A.'s condition in outpatient treatment. *Id.* 241.

On November 23, 2015, T.A.'s parents had him transported to Elevations. *Id.* While at Elevations he was evaluated and diagnosed with mild autism spectrum disorder; major depressive disorder, recurrent, severe; and generalized anxiety disorder. *Id.* 495. His psychologist at Elevations recommended "[a] very high level of residential therapeutic and academic support" and "a therapeutic boarding school setting with good social mentoring" for T.A. *Id.* 496, 499.

Three days after his discharge from Elevations, T.A.'s parents enrolled him in Cherry Gulch. At Cherry Gulch, T.A. participated in a number of therapeutic services, including family therapy, individual therapy, group therapy, and equine-assisted psychotherapy. *Id.* 1239. T.A. remained at Cherry Gulch beyond the time period covered by the administrative record.

## III.    BENEFIT COVERAGE

BCBSNM initially authorized coverage for sixteen days at Elevations. Rec. 1134. BCBSNM identified T.A.'s risk status as "not acceptable to discharge" because of his "head banging, serious suicide attempt within the past 5 months, cutting behaviors, [and] behavioral disturbance." *Id.* 1134. BCBSNM then extended T.A.'s authorization for RTC care for three days due to "aggressive outbursts," *id.* 1131, and for another three days because T.A. continued "to exhibit behaviors requiring holds," *id.* 1127. BCBSNM continued to review T.A.'s case and extended his coverage a number of times due to his continued aggression and inability to be treated

at a lower level of care. *Id.* 1090, 1093, 1095-96, 1098, 1103, 1125. BCBSNM stayed in contact with T.A.'s treating physician as T.A. progressed at Elevations and ultimately determined that, after eighty days of treatment, T.A.'s care at an RTC was no longer medically necessary. *Id.* 1080, 1086-87, 1103. BCBSNM granted an additional day of coverage for T.A.'s parents to arrange to come pick him up. *Id.* 1074. In total, BCBSNM covered eighty-one days of care at Elevations. However, instead of picking up T.A. and placing him the intensive outpatient treatment that BCBSNM discussed with T.A.'s parents and treating provider at Elevations, T.A.'s parents kept him at Elevations for sixty-three more days after the benefits denial. BCBSNM appears to have been unaware of the decision to keep T.A. at Elevations beyond the benefits denial date.

Upon his discharge from Elevations, T.A. enrolled at Cherry Gulch. BCBSNM approved eight days of coverage at Cherry Gulch. *Id.* 1682-83. BCBSNM's approval was based on T.A. "[b]eing a risk of serious harm to self/others." *Id.* 1683. As evidence of T.A.'s aggression, BCBSNM cited a number of events that occurred prior to his admission to Elevations, although, as discussed in more detail below, it appears the reviewer believed these events happened immediately prior to T.A.'s admission to Cherry Gulch. *Id.* 1683 (citing to "aggression with twin brother, peer on school bus, and reported attempt [sic] hanging and cutting with knife"). On April 25, 2016, BCBSNM denied further benefits for T.A.'s stay at Cherry Grove, saying that T.A. could "be safely treated in a less restrictive setting." *Id.* 1190.

IV. **THE PARTIES' ARGUMENTS**

With regard to the ERISA claim, the Plaintiffs make both procedural and substantive arguments. Procedurally, Plaintiffs argue that Defendants improperly denied T.A.'s claims by applying acute criteria to evaluate T.A.'s sub-acute care, by ignoring the opinions of T.A.'s treating

5

providers, and by applying the MCG criteria to T.A.'s claim. Substantively, Plaintiffs argue that T.A.'s care was medically necessary under the MCG criteria used by Defendants.

Defendants respond by first asserting that Plaintiffs have failed to exhaust the administrative process as to all claims after October 2016, as required by the Plan. Defendants further contend that Plaintiffs have failed to demonstrate that T.A.'s continued treatment at Elevations and Cherry Gulch was medically necessary. Finally, Defendants argue that their use of the MCG criteria was appropriate.

With regard to the Parity Act claim, Plaintiffs argue that Defendants violated the Parity Act by applying more stringent medical necessity criteria to mental health care than to medical/surgical care. Defendants counter that their medical necessity standards for mental health care and medical/surgical care fail to meaningfully differ, and further, that any differences had no impact on BCBSNM's decision regarding benefits denial for T.A.

## LEGAL STANDARD

### I. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

For the ERISA claim, when both parties move for summary judgment in an ERISA case, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted). For ERISA claims, "the factual determination of eligibility for benefits is decided solely

6

on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Id.* (citation omitted).

Unlike the denial of benefits claim, the court affords Defendants no deference in interpreting the Parity Act because the interpretation of a statute is a legal question. *See Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016) (citing *Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1233 (10th Cir. 2012)).

## II.     STANDARD OF REVIEW FOR DENIAL OF BENEFITS CLAIM

ERISA authorizes Plaintiffs to challenge a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) but fails to specify the standard of review that courts should apply. *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.,* 585 F.3d 1311, 1315 (10th Cir. 2009). The Supreme Court has filled this gap by determining that, in general, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Both parties agree that the Plan fails to grant any discretionary authority to determine eligibility for benefits. ECF Nos. 74 at 36-43; 95 at 44. As such, this court will review Plaintiffs' claims under a *de novo* standard.

"When applying a de novo standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (citation omitted). The *de novo* "standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision." *Id.* at 833. Rather, "it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review."

*Id.* at 833; *see also Ray v. UNUM Life Ins. Co. of Am.*, 244 F. App'x 772, 782 (10th Cir. 2007) (unpublished) (approving of district court's application of preponderance of evidence standard).

## ANALYSIS

### I. *DE NOVO* REVIEW OF PLAN BENEFIT DENIALS

#### A. Medical Necessity

There is no dispute here as to whether T.A. needed care. The question, rather, is whether the care that T.A. received at Elevations and Cherry Gulch was the proper level of care for his condition under the Plan's definition of medical necessity. The Plan defines medical necessity to include mental healthcare "provided to you at the least restrictive level of care." Rec. 167. BCBSNM used the MCGs to guide its evaluation of whether an RTC was the "least restrictive level of care" appropriate for T.A. *Id.* 1070.[1] The court concludes that neither T.A.'s uncovered care at Elevations nor at Cherry Gulch was medically necessary for the period of time that BCBSNM denied coverage.[2]

---

[1] Plaintiffs argue that BCBSNM erred by relying on the MCGs instead of citing to specific provisions of the Plan. But "[b]ecause the Court's review is de novo, any incorrect reliance on the [MCGs] does not affect the Court's analysis." *Mike G. v. Bluecross Blueshield of Tex.*, No. 2:17-cv-347-TS, 2019 WL 2357380, at *12 (D. Utah June 4, 2019). Plaintiffs similarly complain that BCBSNM referenced "acute" care in several denial letters. Rec. 83, 1159. Again, even if BCBSNM incorrectly relied on acute criteria—about which the court makes no finding—the court's review is still de novo. The court evaluates only whether BCBSNM's denial of T.A.'s claim for subacute RTC care was supported by a preponderance of the evidence. *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 833 (10th Cir. 2008) (unpublished).

[2] Because the court concludes that T.A.'s care at Elevations and Cherry Gulch was not medically necessary for the period of time that BCBSNM denied benefits, it declines to reach the question of whether Plaintiffs properly exhausted the administrative review available to them under the Plan for services received after October 2016. It also need not reach the issue of whether to consider the extra-record declaration submitted by Defendants that addresses the issue of exhaustion. *See* ECF No. 86, Exh. 1.

### i. Treatment at Elevations

T.A.'s condition when BCBSNM denied coverage at Elevations met each of the MCG criteria that BCBSNM uses to determine whether discharge from an RTC is appropriate. *See supra* "The Plan." First, T.A. was adequately stabilized. His Elevations psychologist reported that his "mood had stabilized considerably, and he denies any thoughts or intentions for self-harm or suicide." Rec. 1474. T.A. and his parents understood the follow-up treatment plan. Rec. 1086 ("[R]epresentative confirms the member and / or family understands and agrees to the recommended discharge plan."). Tellingly, several providers not associated with BCBSNM determined that T.A. was ready to step down to a lower level of care. In the week prior to the denial of Elevations benefits, T.A.'s psychologist agreed that he was "approaching or is already at a point where 24 hour RTC is not medically necessary." *Id.* 1082. T.A.'s IEP team also determined that he was prepared to return to school around the same time. *Id.* 292 ("A need for Residential Treatment Center for educational purposes has not been established by current information."). And T.A.'s IEP team was prepared to provide medically necessary supports at school. The IEP team assured Plaintiffs that the public school "can provide the supports and services Dr. Day indicated are needed without residential treatment." *Id.* 289.

Second, T.A.'s functional status was acceptable. His Elevations psychologist reported that he was "able to calm himself down more regularly" and his "self-care has improved dramatically." *Id.* 561. In addition, "[t]he frequency, duration and intensity of his tantrums have improved dramatically" and "[h]is ability to function academically has improved considerably." *Id.* 494. T.A. was certainly not perfect—his psychologist also noted that he "struggles with a limited ability to understand his emotions and needs as well as communicate them in appropriate prosocial ways"— but these struggles could have been managed at a lower level of care. *Id.* 494.

Third, T.A.'s doctors had sufficiently regulated his medication such that he no longer experienced significant adverse medication effects. During the week that benefits at Elevations were denied, T.A. denied any medication side effects. *Id.* 880. He also reported that "he likes the medication changes in that he is more 'focused at times.'" *Id.* 894.

The court additionally notes that BCBSNM engaged in an ongoing conversation with T.A.'s provider at Elevations prior to its discontinuation of benefits. BCBSNM continued benefits several times to accommodate behavioral relapses and to allow time for discharge planning. BCBSNM identified an appropriate, intensive outpatient program placement for T.A. and waited until T.A. was sufficiently stabilized to move to outpatient treatment before denying benefits. Throughout the process, BCBSNM displayed a willingness to evaluate the current facts of T.A.'s situation in making coverage determinations.

In sum, BCBSNM covered a substantial stay at Elevations. This care appears to have led to significant improvements for T.A. such that T.A. met each of the MCG criteria for discharge from an RTC. While T.A. and his family may believe that it would have been optimal for T.A. to remain in an RTC for an extended period of time—and they may be correct—the question here is simply whether T.A. met the conditions for discharge from an RTC, as laid out by the Plan. He did. Thus, BCBSNM's denial of benefits at Elevations from February 12, 2016 onward was appropriate.

### ii. Treatment at Cherry Gulch

The court begins by addressing the initial eight days of coverage provided by BCBSNM at Cherry Gulch, then discusses the remainder of T.A.'s stay at Cherry Gulch. Plaintiffs argue that BCBSNM's decision to cover the first eight days of T.A.'s treatment at Cherry Gulch suggests that T.A. was entitled to benefits for the remainder of his time at Elevations, as well as going forward

at Cherry Gulch. For Plaintiffs, the eight days of coverage essentially constitute an admission that T.A.'s condition necessitated RTC-level care. In response, Defendants argue that the initial coverage at Cherry Gulch resulted from a misunderstanding. According to Defendants, the BCBSNM reviewer believed that T.A. had returned home, as planned, after eighty-one days at Elevations. Thus, Defendants argue, the reviewer mistakenly considered events that occurred when T.A. lived at home, which the reviewer believed took place immediately prior to T.A.'s arrival at Cherry Gulch but which actually happened prior to his stay at Elevations. These events, Defendants maintain, failed to account for T.A.'s improvement at Elevations.

Defendants' explanation for their initial coverage of T.A.'s stay at Cherry Gulch is consistent with the record. BCBSNM's initial coverage decision appears to have been based on information that Cherry Gulch represented was T.A.'s "present state" but that actually described his condition prior to entry at Elevations. As evidence, the court notes that the BCBSNM reviewer stated that T.A.'s "[p]resent problem[s]" included a "physical altercation towards his brother at home, peer on school bus, some self-harm" as well as "tried to hang self twice"—all events that occurred prior to T.A.'s treatment at Elevations. Rec. 1682. The reviewer's notes indicate that he mistakenly believed that T.A. left Elevations on February 18, 2016, after BCBSNM denied further coverage, which explains why he believed that T.A. was living at home immediately prior to arriving at Cherry Gulch. *See id.* 1682 (noting "81 days RTC 11/23/15 to 2/18/16" and that T.A. "[l]ives with Parents"). Therefore, the record indicates that BCBSNM did not believe that T.A.'s symptoms "magically abated" after just eight days when it subsequently denied benefits. ECF No. 75 at 50. Rather, once BCBSNM discovered its error, it re-evaluated T.A.'s case in light of his actual status in April 2016.

11

In keeping with his improvement at Elevations, T.A. generally displayed the stable functioning required for discharge from an RTC while at Cherry Gulch. Staff observed that "the intensity and frequency of tantrums have decreased" although they "do still happen from time to time." Rec. 1458; *see also id.* 1459 ("[M]eltdowns are less frequent and of shorter duration."). And T.A. himself recognized his progress, saying that "it wasn't that hard" to calm himself down. *Id.* 1459. At Cherry Gulch, T.A. "indicated no recent SI [suicidal ideation]" and he had not "engaged in any SIB [self-injurious behavior]." *Id.* 1460.

T.A., of course, hit some bumps in the road along the way. T.A. continued to become angry at times. *Id.* 1246, 1460, 1586. Some days he was lethargic and difficult to roust out of bed. *Id.* 1458. But the fact that T.A. continued to suffer from some behavioral issues does not demonstrate that T.A.'s continued residential treatment care was medically necessary. When T.A. became angry he "recovered quickly and processed with staff after." *Id.* 1246. As the treatment notes before the court indicate, T.A. could have been treated at a lower level of care.

The main incident that raises a red flag for the court in terms of medical necessity occurred around May 4, 2016.[3] T.A. "took off" and when staff later found him, he reported that he "was trying to get back to the damn [sic]" because he "wanted to jump off." *Id.* 1462. Plaintiffs characterize this as a "suicide attempt" whereas Defendants posit that T.A. had experienced only suicidal ideation and was headed back to Cherry Gulch. Whether this was a suicide attempt is critical, because the MCGs do not permit discharge from an RTC if a patient recently attempted suicide.

The evidence in front of the court is unclear. T.A.'s own words appear to indicate an intent to attempt suicide. Cherry Gulch placed T.A. on suicide watch following the incident, which

---

[3] As a reminder, BCBSNM covered April 18, 2016, through April 25, 2016, at Cherry Gulch.

12

indicates the program took his actions seriously. *Id.* 1534. Yet in the same report that relays the alleged suicide attempt, T.A.'s treating physician at Cherry Gulch indicated that his "[t]hought content is without . . . SH [self-harm], SI [suicidal ideation]." *Id.* 1464. The doctor further indicated that T.A. "has done really well since [the incident]." *Id.* 1462. "Plaintiffs have the burden of demonstrating that residential treatment was medically necessary." *Mike G. v. Bluecross Blueshield of Tex.*, No. 2:17-cv-347-TS, 2019 WL 2357380, at *12 (D. Utah June 4, 2019); *see also LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 800 (10th Cir. 2010) (holding that "[i]t was [Plaintiffs'] burden to establish a covered loss" where the court conducted a de novo review). In light of this conflicting evidence, the court finds that Plaintiffs have failed to carry their burden of showing that RTC care at Cherry Gulch was medically necessary.

    B.  *Opinions of Treating Professionals*

Plaintiffs further argue that Defendants reached the wrong conclusion regarding medical necessity after ignoring the opinions of T.A.'s treating professionals. "Nothing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). "Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id.* At the same time, "administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. The Tenth Circuit echoes this standard, holding that "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004).

Plaintiffs submitted several letters from treating providers in their appeals. Plaintiffs argue that Defendants failed to take these letters into account in conducting their review of T.A.'s case. Plaintiffs are correct that each letter denying Plaintiffs' appeal of Defendants' denial of coverage fails to indicate that the reviewer considered the treating physician letters submitted by Plaintiffs. *See* Rec. 20 (noting that BCBSNM reviewed MCGs, benefits booklet, and clinical data received from facility in denying the Elevations claim); *id.* 1159 (noting that BCBSNM reviewed documents provided by facility, benefits booklet, and MCGs in denying Cherry Gulch claim).

But the question in front of this court is not whether BCBSNM engaged in procedural irregularities; issues of procedural irregularity go to what standard of review this court should employ. Rather, this court is tasked with deciding "whether the administrator made a correct decision." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (citation omitted).

This is not an instance where BCBSNM had "little or no evidence in the record to refute [Plaintiffs'] theory." *See Gaither*, 394 F.3d at 807. In fact, some of the letters from T.A.'s treating physicians, provided by Plaintiffs, actually bolster the conclusion that T.A.'s condition met the MCG criteria for discharge from an RTC. For example, Cynthia Cohen stated that while T.A. was "unable to function" prior to entering Elevations, once he settled into the program "he was able to begin to function." Rec. 1041. One of the criteria for discharge is T.A.'s ability to function—that "[n]o essential function is significantly impaired" or that "[a]n essential function is impaired, but impairment is manageable at available lower level of care." *Id.* 5916. The statement by T.A.'s provider suggests that treatment at Elevations enabled him to gain the ability to perform essential functions. T.A.'s outpatient psychiatrist similarly noted that Dr. Day's report indicated that "it is

14

clear he is doing better," although he expressed skepticism that the public schools could sufficiently support T.A. *Id.* 1047.

In contrast, each of the letters submitted by Plaintiffs comes from a provider whose work with T.A. predates his admission to Elevations. Therefore, while his prior providers may "highly recommend that [T.A.] remain in intensive inpatient residential treatment," that recommendation is based on outdated information or on reports of T.A.'s experience at Elevations, not a clinical assessment of T.A.'s present state. *Id.* 1044. None of his providers appear to have actually met with T.A. following his stay at Elevations, meaning that none could evaluate how any improvement at Elevations impacted the need for RTC care going forward. Most of the letters simply indicated that the author had read Dr. Day's report and based his or her opinions on the report and work with T.A. prior to his improvements at Elevations. *Id.* 1044; 1047. The court has considered the opinions of T.A.'s treating physicians but remains convinced that continued RTC treatment was not medically necessary.

In sum, the court holds that Plaintiffs have failed to carry their burden of proving that treatment at Elevations and Cherry Gulch outside of the covered period was medically necessary. Therefore, the court DENIES Plaintiffs' motion for summary judgment on the ERISA claim and GRANTS Defendants' motion for summary judgment on the ERISA claim.

## II. PARITY ACT CLAIM

Both parties also move for summary judgment on Plaintiffs' Parity Act claim. The Parity Act requires that a plan that provides for "both medical and surgical benefits and mental health or substance use disorder benefits" must not impose more treatment limitations on the latter than it imposes on the former. 29 U.S.C. § 1185a(a)(3)(A). As Judge Shelby noted, "in effect, the Parity Act prevents insurance providers from writing or enforcing group health plans in a way that treats

15

mental and medical health claims differently." *David S. v. United Healthcare Ins. Co.*, No. 2:18-cv-803-RJS, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019) (citing *Munnelly v. Fordham Univ. Fac.*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018) ("Essentially, the Parity Act requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone." (citation and alterations omitted))).

To establish a Parity Act violation, Plaintiffs must demonstrate that (1) the Plan is subject to the Parity Act; (2) the Plan provides benefits for both mental health and medical/surgical treatments; (3) Defendants placed differing limitations on benefits for mental health care as compared to medical/surgical care; and (4) the limitations on mental health care are more restrictive. *See Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) (citing framework laid out in *A.H. ex rel. G.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387, at *6 (W.D. Wash. June 5, 2018), and noting that "there is no clear law on what is required to state a claim for a Parity Act violation" but that many courts follow the "baseline standard" laid out in *A.H.*). To give substance to the fourth prong of the test, the Parity Act's implementing regulations define treatment limitations as "both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits." 29 C.F.R. § 2590.712(a). Nonquantitative treatment limitations include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness" and "[r]efusal to pay for higher-cost therapies until it can be shown that a lower-cost therapy is not effective." 29 C.F.R. § 2590.712 (c)(4)(ii)(F).

The parties do not dispute that the Plan is subject to the Parity Act and provides both mental health and medical care. Nor do the parties dispute that the Plan includes different medically

necessary criteria for mental health treatment. Rather, the parties' disagreement centers around whether the differing limitations constitute a facial Parity Act violation, and if so, whether the facially violative language had any nexus to BCBSNM's decisions in T.A.'s case.[4] Plaintiffs argue that the Plan's medical necessity criteria for mental health care is more stringent on its face than the Plan's definition of medical necessity for medical/surgical benefits. Plaintiffs highlight two instances where they argue that the medical necessity criteria differ saliently: (1) medical/surgical care must be "the most appropriate" whereas mental health care must be provided "at the least restrictive level of care"; and (2) medical/surgical care must be "known to be effective in improving health outcomes" whereas mental health care must be "expected to result in significant

---

[4] Defendants point out that Plaintiffs raise their facial Parity Act arguments for the first time in their motion for summary judgment and response to Defendants' motion for summary judgment. In contrast, Plaintiffs' complaint relies on an as-applied challenge that alleges T.A. was required to meet acute medical criteria to obtain care at a subacute residential treatment facility, but that BCBSNM would have applied subacute criteria had T.A. instead sought care at a subacute medical/surgical facility. "Issues raised for the first time in a plaintiff's response to a motion for summary judgment may be considered a request to amend the complaint, pursuant to Fed. R. Civ. P. 15." *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 790 n.9 (10th Cir. 1998); *see also Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir. 1991) ("[A] plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, 'provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.'" (quoting 5 CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 1219, at 194 (1990))). The shift from an as-applied challenge to a facial challenge does not prejudice Defendants, as Defendants had ample space to respond to the new argument. Further, Defendants were well aware that Plaintiffs planned to raise Parity Act arguments and thus could not have been caught off guard by this change in Plaintiffs' strategy. Because the new claim did not prejudice Defendants, the court will treat Plaintiffs' filings as amending their complaint to add a facial challenge to the Parity Act.

The court further notes that Plaintiffs raise two facial Parity Act claims in their response to Defendants' motion for summary judgment: (1) Defendants facially violated the Parity Act by applying a stricter definition of "medically necessary" to mental health care than to medical/surgical care; and (2) Defendants facially violated the Parity Act by applying more stringent requirements for benefits received at a residential treatment facility than treatment at an inpatient hospice facility. ECF No. 93 at 19. Plaintiffs appear to withdraw the hospice argument in their reply brief on their own motion for summary judgment. ECF No. 97 at 17. As such, the court addresses only the first argument.

and sustained improvement." Defendants counter that Plaintiffs simply point to different definitions, which Defendants argue is insufficient to establish that one definition was more exacting than the other.

The parties first argue over whether "the most appropriate" differs substantively from "the least restrictive level of care." The court finds the terms comparable. "Least restrictive" is a term of art often used by mental health advocates in the disability law field. Donald H. Stone, *The Least Restrictive Environment for Providing Education, Treatment, and Community Services for Persons with Disabilities: Rethinking the Concept*, 35 TOURO L. REV. 523, 524, 538 (2019) (referring to the least restrictive environment as "[t]he bedrock principle of disability law" and noting that "mental health advocates had long fought for the less restrictive environment principle for mental health treatment"); Michael L. Perlin, *"Their Promises of Paradise": Will* Olmstead v. L.C. *Resuscitate the Constitutional "Least Restrictive Alternative" Principle in Mental Disability Law?*, 37 HOUS. L. REV. 999, 1016 (2000) ("[The least restrictive environment's] doctrinal importance as one of the most important trends in mental health law cannot be questioned." (citation omitted)). As scholars have noted, "[a]t the cornerstone of disability protection is the concept of providing services in the least restrictive environment . . . or the most integrated setting appropriate, known as the mainstreaming concept." Stone, *Least Restrictive Environment*, *supra*, at 523. In disability law—including in the mental health context—"least restrictive" is simply another way of indicating that the individual is at the most appropriate level of care—i.e., the care that allows them the most mainstream experience possible. Because "least restrictive" is comparable to "most appropriate" in the context of mental health disabilities, the court finds that "least restrictive" is not a more stringent requirement than "most appropriate."

The court, however, finds the second set of criteria that Plaintiffs identify to be more problematic. Plaintiffs argue that the medical/surgical requirement that a treatment is "known to be effective in improving health outcomes" diverges substantially from the requirement that a mental health treatment be "expected to result in significant and sustained improvement." The court agrees. One could imagine a treatment that improves a patient's health outcome in the short term by managing symptoms without leading to any sustained improvement. Similarly, one could imagine a treatment that marginally—but not significantly—improves a patient's health outcome. In both instances, the treatment would only qualify under the medical/surgical standard for medical necessity, not the mental health standard. By pointing to Defendants' more stringent definition of medical necessity for mental health care than for medical/surgical care, Plaintiffs demonstrate how the Plan runs afoul of the Parity Act.

Once Plaintiffs establish that particular language in the Plan violates the Parity Act, the parties further disagree about who bears the burden of proof on the issue of causation—whether the violative language actually impacted BCBSNM's decision as to T.A.'s care. Defendants argue that Plaintiffs bear the burden of proving that the facial Parity Act violation negatively impacted T.A.'s care. Plaintiffs contend that once they have shown that Defendants facially violated the Parity Act, the burden should shift to Defendants to establish that the facially violative language did not actually lead to a stricter application in T.A.'s case. But the court need not reach this argument because even if the burden had shifted to Defendants, Defendants have established that there is no issue of material fact as to whether a nexus exists between the violative language and T.A.'s benefits denial. BCBSNM did not deny T.A. coverage because it determined that treatment at an RTC would not lead to "significant and sustained improvement." Rather, BCBSNM twice declined to cover further time at an RTC precisely because T.A. *had* made significant and sustained

19

improvement, and thus no longer necessitated RTC-level care. In light of the lack of nexus between the facially violative language and the decision in T.A.'s case, the court finds that Defendants have shown the absence of a genuine issue of material fact as to the Parity Act claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (noting that the burden of the moving party may be discharged by "'showing' . . . that there is an absence of evidence to support the nonmoving party's case"). Thus the court GRANTS Defendants' motion for summary judgment and DENIES Plaintiffs' motion for summary judgment.

## ORDER

For the foregoing reasons, the court GRANTS the Defendants' motion for summary judgment and DENIES the Plaintiffs' motion for summary judgment.

DATED October 14, 2021.

BY THE COURT

Jill N. Parrish
United States District Court Judge